F I L E D
Clerk
District Court

SEP 18 2023

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| TANG'S CORPORATION, | Case No. 1:20-cv-00006 |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC, | |
| Defendant. | |

## I.     INTRODUCTION

In this diversity action, Plaintiff Tang's Corporation ("Tang's Corp.") alleges that around late 2015 or early 2016, Defendant Imperial Pacific International (CNMI) LLC's ("IPI") project manager, Wu Li Wen ("Mr. Wu"), requested Tang's Corp. to remove construction pilings and mixed metals from IPI's construction site in Garapan, Saipan and temporarily store them for no more than six to eight months. (Third Am. Compl. "TAC," ¶¶ 15-18, ECF No. 47.) According to Tang's Corp., Mr. Wu represented that the materials urgently needed to be removed for construction of the new casino resort hotel project to continue. (*Id.* ¶¶ 15, 22.) Tang's Corp. contends that Mr. Wu, on behalf of IPI, orally agreed to pay the corresponding permitting fees, monthly management fees, land use fees, and insurance costs for the storage of the construction materials. (*Id.* ¶¶ 25-31.) After IPI failed to pay,

Tang's Corp. filed this action alleging IPI breached the oral contract for the storage of construction materials. (*Id.* ¶ 39.)[1]

Before the bench trial commenced, the parties filed a joint stipulation of facts ("Joint Stip. Facts," ECF No. 108), which the Court accepted during the trial (Mins. – Day 1, ECF No. 118). Additionally, the parties each filed their own respective Proposed Findings of Fact and Conclusions of Law ("Proposed FFCL"). (Def.'s Proposed FFCL, ECF No. 113; Pl.'s Proposed FFCL, ECF No. 115.) At the three-day bench trial, fifteen exhibits were admitted into evidence. (ECF No. 128-1.) Tang's Corp. presented one witness, and Defendant presented two witnesses. (*Id.*) The Court now issues its Findings of Fact and Conclusions of Law.

## II.    FINDINGS OF FACT

The Court makes the following findings of fact based on all the evidence received at the bench trial in this matter, including the parties' joint stipulation of facts.

### A.   **IPI's Construction Project**

1.  "IPI is a limited liability company organized and existing under the laws of the CNMI." (Joint Stip. Facts ¶ 2.)

2.  "On December 28, 2015, IPI entered into a Saipan Integrated Resort Project (Phase I) General Construction Contract ('General Construction Contract') with MCC International Saipan Ltd. Co. ('MCC') [written] in [both] Chinese and English. Defendant's Exhibit I is a true and accurate copy of the Chinese and English versions of the General Construction

---

[1] Prior to commencement of the bench trial, the parties filed a stipulated motion to limit the bench trial to arguments on the oral agreement for storage of construction materials as the parties had settled the second claim regarding the written consultancy agreement (Stip. Mot., ECF No. 112), which the Court granted (Mins. – Day 1, ECF No. 118).

Contract." (Joint Stip. Facts ¶ 3.) IPI, the employer under the Contract, entrusted MCC as its general contractor for the Grand Mariana Casino and Hotel Resort project in Garapan, Saipan for a provisional amount of two hundred million U.S. dollars ($200,000,000.00). (Trial Ex. I at 094.) Section 4.23 of the General Construction Contract specified that "[d]uring the construction period, [MCC] shall keep the site free of all unnecessary obstacles, and shall properly store and dispose of the contractor's equipment or remaining materials. [MCC] shall remove and transport away any debris, garbage and temporary project that are no longer needed from the site." (*Id.* at 113.)

3.  Mr. Wu signed the General Construction Contract as a witness for IPI. (Ex. I-011 at 12.) Five months after the Contract was signed, IPI employed Mr. Wu as a civil engineer for the period from May 12, 2016 through May 5, 2017. (Trial Exs. L, M.) Mr. Wu had two offices—one made from a double decker container, which was shared with MCC and placed along the roadside in Garapan and another in a large nearby office building where the ABC Store is located.

**B.  Removal of Pilings from Job Site**

4.  Around late 2015 and early 2016, the construction project entered into a phase where construction pillars needed to be removed from the job site. The pillars are large, concrete tubes that are driven into the sand to create a foundation for large buildings. (ECF No. 129 at 9-10, 83-84.) The pillars urgently needed to be removed from the job site as they obstructed movement of equipment and prevented the construction workers from moving around freely.

5. There are two types of pillars: pilings, also referred to as boulders that can be recycled; and rocks from the existing sediment dug from the foundation. (Trial Tr. Vol. I at 10:1-7, ECF No. 129.) One piling is approximately five tons and fifteen to forty-five meters long. Although the pilings are larger than the rocks, both exceed the maximum size limit of materials permitted for disposal in Saipan's landfill. To be placed into the landfill, the pillars need to be crushed and broken down.

6. Tang's Corp. "is a corporation organized and existing under the laws of the Commonwealth of [the] Northern Mariana Islands ('CNMI')." (Joint Stip. Facts ¶ 1.)  The president of Tang's Corp. is Mr. Ting Jian Tang, also known as Wayne or Kevin. (Trial Tr. Vol. I. at 6:6-16; 90:14-16.).

7. Tang's Corp. is a construction company in existence since 2007 that, among other projects, rents heavy equipment. (*Id.* at 8:3-10.) From 2012 to 2019, Tang's Corp. operated the Marpi landfill pursuant to a contract with the CNMI government. (*Id.* at 11:13-19.)

8. Tang's Corp. was approached to transport and remove the pillars given its background of managing the Marpi landfill.

9. IPI's general contractor MCC, through its project manager, contacted Mr. Tang and introduced Mr. Tang to Mr. Wu. MCC represented that Mr. Wu was in charge of the IPI construction project and "the one calling the shots." (*Id.* at 18.)

10. In January 2016, Mr. Tang, Mr. Wu, and two personnel from MCC had a meeting in the container office to discuss the pilings. MCC personnel stated that it would pay for trash removal. However, Mr. Wu represented that the pilings were not trash as IPI wanted to use

4

them for the Mariana Resort project located near Marpi, Saipan. Mr. Wu requested Mr. Tang find storage space for the pilings. Mr. Tang explained that he did not know how much it would cost. In response, Mr. Wu told Mr. Tang to just get the job done and IPI and Tang's Corp. would sign a contract after the fact. Mr. Wu further explained that IPI would pay for the storage and management fees for the pilings and estimated storage was only needed for six to eight months. Additionally, Mr. Wu represented that IPI would reimburse Tang's Corp. for all costs incurred for the storage of the pilings. MCC personnel represented that MCC would cover the costs of transporting the pilings.

11. To find space to store the pilings, Mr. Tang inquired and coordinated with various local agencies, including the Department of Public Works ("DPW"), the Department of Public Lands ("DPL"), and the Office of the Attorney General. The first idea to store the pilings in the Marpi landfill proved untenable. Mr. Tang brought the next idea of storing the pilings on the lot next to Marpi to Mr. Wu and MCC. They told Mr. Tang to proceed with submitting the request to store the pilings on the lot. This location was chosen, as opposed to one of IPI's other properties, because it was close to the Mariana Resort, which was the location IPI intended to use the pilings, and special permits would be needed to store the pilings on IPI property. Mr. Tang informed Mr. Wu and MCC that there would be more steps in order to store the pilings. Mr. Wu told Mr. Tang that it was urgent to remove the pilings and asked Mr. Tang to just take care of the situation.

12. On January 5, 2016, Tang's Corp. and MCC entered into a Waste Services & Disposal Agreement effective on January 20, 2016 ("Agreement"). (Trial Ex. A.) Pursuant to the

Agreement, Tang's Corp. would provide MCC "collection, management, transportation, disposal, treatment, and//or [sic] recycling or other waste processing services" for MCC's waste, which included "large rocks." (*Id.* at 1, 8.) Further, "[t]itle to and ownership of Waste that are authorized and acceptable under the provisions of this Agreement and the applicable Addendum(s) shall transfer to [Tang's Corp.] upon its final acceptance of such Waste for disposal, or final acceptance for transportation if the terms of the applicable Addendum includes transportation of the Waste by [Tang's Corp.]." (*Id.* at 2.)

13. The parties stipulated that "[f]rom January 28, 2016 to February 2, 2016, Tang's Corp. collected and transported twenty car loads of concrete pillars, also referred to as 'boulders' or 'rocks,' from MCC. For each car load of pillars, pursuant to paragraph 1 of the Waste Services & Disposal Agreement, MCC prepared a Waste Profile in Chinese with photos, a description of the contents, and calculated processing fee of the car load, and Tang's Corp. prepared an invoice in English. Defendant's Exhibit E is a true and accurate copy and Defendant's Exhibit F is a true and accurate English translation of the MCC Waste Profile for each car load. Defendant's Exhibit G is a true and accurate copy of Tang's invoices for each car load." (Joint Stip. Facts ¶ 5.)

14. Another company, U.S.A. Fanter, also transported pilings from the project for MCC but to a different site near lower Navy Hill.

15. Tang's Corp had the capability to crush up both the pilings and rocks; however, pursuant to Mr. Wu's instructions, it only broke down the rocks, not the pilings.

16. The documentation from MCC (Trial Ex. F) and Tang's Corp.'s invoices (Trial Ex. G) indicate that Tang's Corp. transported pillars—both pilings and rocks. First, Mr. Tang testified that Trial Exhibit F (MCC's documentation) details the transportation of pillars that were not broken down. (Trial Tr. Vol. I at 103:25-104:10.) Additionally, the MCC documentation uses the term "pillars." (Trial Ex. F.) Second, Tang's Corp.'s invoices were for both long pilings and the short rocks. (ECF No. 129 at 114:9-10.) Moreover, Tang's Corp.'s invoices appear to reflect all loads that Tang's Corp. transported. (ECF No. 129 at 111:12-15.) Trial Exhibit N, a demonstrative exhibit collecting the data from Trial Exhibits F and G, specifies that Tang's Corp. transported 592.1 tons of pillars. (Trial Ex. N.)

17. Mr. Tang testified that Tang's Corp. transported about 4,000 tons of pilings to a DPL lot adjacent to the Marpi landfill. (Trial Tr. Vol I. at 15:15-17.)

**C. Costs Incurred**

18. From January 2016 through March 2017, Mr. Wu gave assurances to Mr. Tang that IPI would pay for all costs associated with storing the pilings.

19. Tang's Corp. paid Steve Honey, an engineer, $1,500 for his services related to storage of the pilings. Mr. Honey's services included going to local agencies, including DPL, DPW, and the Bureau of Environmental and Coastal Quality, in order to obtain permits to store the pilings.

20. DPL permitted Tang's Corp. to begin moving the pilings prior to finalizing the details of the arrangement. After Tang's Corp. transported the pilings, DPL and Tang's Corp. had a meeting wherein DPL informed Tang's Corp. that it would cost around $20,000 a year to

store the pilings. Tang's Corp. and DPL entered into the Temporary Occupancy Agreement to allow Tang's Corp. to "store landfill materials" on the lot in Marpi for $20,983.76 a year. (Trial Ex. C at 2-4.) The Court received into evidence a copy of the unsigned Temporary Occupancy Agreement that Mr. Tang signed with DPL. Although Mr. Wu represented that IPI did not need an entire year to store the pilings, one year was the shortest period DPL offered.

21. On March 15, 2017, Tang's Corp. paid DPL $20,983.76. (Trial Ex. 6.) Mr. Tang informed Mr. Wu that he had made the payment, and presented Mr. Wu the Temporary Occupancy Agreement. Mr. Wu told Mr. Tang to put the receipt in a package with receipts of other incurred costs and to provide the entire package to him.

22. Pursuant to the Temporary Occupancy Agreement, Tang's Corp. was required to obtain liability insurance. (Trial Ex. C at 6-7.) Mr. Tang went to various companies to find the best price and ultimately selected Pacific Basin Insurance Company. Tang's Corp. paid $2,500 for liability insurance for the storage of the pilings on the land plot with coverage from July 14, 2017 through July 14, 2018. (Trial Ex. H.)

23. Tang's Corp. charged IPI a management fee of $1,500 each month over a period of four years, 2016 through 2019. The management fee covered various costs Tang's Corp. incurred for the storage of the pilings, such as installing warning signs and a border around the pilings to prevent the pilings from rolling. Mr. Wu agreed to pay the management fees as it would also encompass the work required to obtain the requisite permits.

24. Mr. Honey prepared a draft contract between Tang's Corp. and IPI regarding the storage of the pilings. Various versions of the contract were prepared between January 2016 and March 2017 because Mr. Wu requested changes to the contract. Mr. Wu was provided a copy of each updated version of the contract. Around March 2017, Mr. Wu represented for the first time that IPI executives needed to verify and approve the contract. Trial Exhibit B is a copy of the final version of the draft contract. Although Mr. Tang signed, initialed, and dated the document for January 2016, the contract includes language regarding events that occurred after January 2016 such as an agreement made in March 2016 and the application for the DPL Temporary Occupancy Agreement in April 2016 (*see id.* at 2). No one from IPI signed this draft contract.

25. An invoice dated October 16, 2018, on Tang's Corp. letterhead was prepared for the total amount IPI owed Tang's Corp. for storage of the pilings. This document was first sent to IPI in October 2018. The invoice was updated to include new fees incurred with DPL in 2019. Trial Exhibit J is a copy of the updated invoice that was sent to IPI's Chief Financial Officer Eddie Chen, who signed the invoice as received on April 5, 2019.

26. Several times, Mr. Tang gave Mr. Wu invoices for services rendered and costs that Tang's Corp. incurred, such as when Tang's Corp. was transporting the pilings. In March 2017, after Mr. Tang paid DPL the $20,983.76 fee, Mr. Tang went to Mr. Wu's office located in the ABC Store building and provided Mr. Wu a package of documents relating to the storage of the pilings, which included the Temporary Occupancy Agreement, the receipt from DPL, and the draft contract. During this March 2017 meeting, Mr. Wu introduced Mr.

Tang to IPI's female accountant. Another time that Mr. Tang provided the documents to Mr. Wu at his office in the ABC Store building, IPI's owner, Mr. Shi, was present. At this time, Mr. Tang explained to Mr. Shi the agreement regarding the storage of the pilings. (Trial. Tr. Vol. I at 19, 65.) In 2019, Mr. Tang went to the MH buildings and provided the same documents to Mr. Chen from IPI.

**D.  Current Status**

27. Mr. Tang is unaware of any other company that could use the pilings, but he did attempt to find other companies to use them. For example, he inquired with the Mayor of Saipan and the Department of Natural Resources.

28. To this day, the pilings are still being stored in the lot next to Marpi.

29. Tang's Corp. has the capability to crush the pilings, but Mr. Tang estimates that it would cost more than $100,000 to break down the pilings.

30. DPL is still charging Tang's Corp. a monthly holdover fee. (*See* Trial Ex. 8.) As of November 29, 2022, the current balance of fees owed to DPL for the storage of the pilings on the lot next to the Marpi landfill is $164,903.36, and DPL continues to charge Tang's Corp. $2,616.72 a month as a holdover fee. (*Id.*)

**III.    CONCLUSIONS OF LAW**

Based on the evidence presented at trial, the Court concludes that Tang's Corp. established its breach of contract claim and its alternative claim of unjust enrichment.

/ /

/

### A.  Applicability of CNMI Substantive Law

In a diversity action raising state law claims, the substantive law of the forum state applies. *See Med. Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806, 812 (9th Cir. 2002). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). "When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n.7 (9th Cir. 2000) (quoting *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993)). Rules of the common law, including the Restatements, "shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary." 7 CMC § 3401. "When there is no dispositive Commonwealth authority on an issue, we may look to persuasive authority from other jurisdictions." *Commonwealth v. Lot No. 353 New G*, 2012 MP 6 ¶ 16 (N. Mar. I. 2012).

### B.  Breach of Contract

Under CNMI law, the elements for a breach of contract are: "(1) the existence of a valid contract; (2) the breach of an obligation imposed under the contract; and (3) damage to the plaintiff resulting from the breach." *Pac. Rim Land Dev., LLC v. Imperial Pac. Int'l (CNMI), LLC*, No. 19-cv-00016, 2020 U.S. Dist. LEXIS 74812, at *14, 2020 WL 1942454, at *5 (D. N. Mar. I. Apr. 23, 2020) (quoting *Ada v. Nakamoto*, Civil Action No. 08-0029 D (N. Mar. I Super. Ct. Sept. 2, 2011)), *aff'd*, No. 20-16047, 2021 U.S. App. LEXIS 31334, 2021 WL 4872460 (9th Cir. Oct. 19, 2021). "The

essential elements of a contract are offer, acceptance, and consideration." *Markoff v. Lizama*, 2016 MP 7 ¶ 10 (N. Mar. I. 2016) (citations omitted). "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Id.* (citation omitted). "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance." *Id.* (citation omitted).

Here, there was manifestation of mutual assent that Tang's Corp. would make all necessary arrangements to store the pilings, such as obtaining a lease and requisite permits, for the benefit of IPI for six to eight months, and IPI would pay for the storage and reimburse Tang's Corp. for all costs incurred. These critical terms were orally agreed upon by Mr. Wu on behalf of IPI and Mr. Tang on behalf of Tang's Corp. at the January 2016 meeting in the container office with the three parties: IPI, MCC, and Tang's Corp.[2] Although there is conflicting evidence regarding the total weight of pilings that Tang's Corp. moved and stored for IPI, the oral agreement did not specify the exact quantity of pilings that IPI needed Tang's Corp. to move. Rather, the oral agreement referred to the pilings that were at the construction site, which were preventing construction from continuing. It is clear that all the pilings that Tang's Corp. moved from the construction site in Garapan to the lot in Marpi are the pilings subject to this oral agreement.

Therefore, the Court finds that an oral contract was formed; however, IPI raises several affirmative defenses the Court must address before determining whether IPI breached the contract.

/ /

---

[2] These conclusions are based largely on the testimony of Mr. Tang, who the undersigned found credible as to the terms of the oral agreement.

### i. Statute of Frauds

IPI asserts that the CNMI's Statute of Frauds invalidates this oral agreement. (Def.'s Proposed FFCL 12.) In the CNMI, "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is "invalid unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent[.]" 2 CMC § 4914(a). Notably "the enforceability of a contract under the one-year provision *does not turn on the actual course of subsequent events*, nor on the expectations of the parties as to the probabilities." Restatement (Second) of Contracts § 130 cmt. a (Am. L. Inst. 1981) (emphasis added). Although a writing was prepared in an attempt to memorialize the terms of the oral agreement (Trial Ex. B), IPI did not sign it.[3] Thus, the Court finds that the terms agreed upon at the January 2016 meeting in the container office govern any agreement. At this meeting, the parties agreed that the pilings were to be stored for six to eight months. The fact that the pilings have been stored for over seven years is immaterial. By the terms of the agreement, performance was to be completed in less than a year; therefore, the Statute of Frauds does not invalidate the oral contract.

### ii. Authority to bind IPI to oral agreement

IPI also argues that Mr. Wu lacked authority to bind IPI to this agreement. (Def.'s Proposed FFCL 11-12.) "When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and third party agree otherwise." Restatement (Third) of

---

[3] Moreover, it appears this document was backdated—specifically, Mr. Tang signed, initialed, and dated the writing for January 2016. (Trial Ex. B.) Yet it includes events that occurred in March and April of 2016. (*Id.* at 2.)

Agency § 6.01 (Am. L. Inst. 2006); *see also Jae Oh v. Angel Ent., Inc.*, 2000 MP 6 ¶ 21 (N. Mar. I. 2000) (citations omitted) ("An agent's act, although without actual authority, may be with such apparent authority as to bind the principal."). Actual authority exists when "the principal has manifested an intent that the agent perform a specific action." *USPG, Inc. v. LSG Lufthansa Serv. Saipan Inc.*, Civil Action No. 98-0432, Decision and Order Denying Mot. and Cross-Mot. for Summary J., at \*3 (N. Mar. I. Commw. Super. Ct. Apr. 6, 1999) (quoting Restatement (Second) Agency (1958) § 7 cmt. b (Am. L. Inst. 1958)). Conversely, "[a]pparent authority requires that the words or conduct of the principal are communicated to a third party who on that basis relies on the agent." *Id.* (quoting Restatement (Second) Agency § 27). "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* at \*3-4 (quoting Restatement (Second) Agency § 27). Further, "[a]n agent cannot create apparent authority acting alone." *Id.* at \*4 (citation omitted). Apparent agency can arise "where the principal has intentionally or negligently allowed others to believe the agent has authority" or from "the principal's negligent omission or his acquiescence in the agent's activities." *Island Leisure Corp. v. Rasa*, Civil Action No. 99-0135, Findings of Fact and Conclusions of Law, at \*5-6 (N. Mar. I. Commw. Super. Ct. Mar. 5, 2002) (first quoting *C.A.R. Transp. Brokerage Co., v. Darden Rests., Inc.*, 213 F.3d 474, 479 (9th Cir. 2000); and then quoting *Lux Art Van Serv., Inc. v. Pollard*, 344 F.2d 883, 888 (9th Cir. 1965)), *rev'd on other grounds*, 2004 MP 4 (N. Mar. I. 2004). In *Island Leisure Corp.*, the hotel plaintiff sued the Tinian Casino Gaming Control Commission ("TCGCC") and a TCGCC consultant for the consultant's unpaid hotel expenses.

*Id.* at *1-2. At the initial hotel check-in, a known member of TCGCC assured the hotel staff that the consultant was an employee of TCGCC. *Id.* at *2, *5. Although the TCGCC member "did not affirmatively state that TCGCC would not be responsible" for the contractor's hotel costs, the Court concluded that the TCGCC member's inaction was sufficient to conclude that the TCGCC member "had the apparent authority to cause Defendant TCGCC to pay the costs incurred by [the contractor.]" *Id.* at *5-6.

In the present case, no evidence had been presented to establish that IPI granted Mr. Wu actual authority to enter contracts on behalf of IPI at the time this oral contract was formed, which Tang's Corp. conceded. In fact, IPI's records indicate that Mr. Wu's employment with IPI did not begin until May 12, 2016 (Trial Ex. M), four months after the oral contract was formed. Thus, Mr. Wu did not have actual authority to bind IPI to this oral contract at the time it was made.

On the other hand, there is ample evidence to support a finding that Mr. Wu had apparent authority to enter the oral contract on IPI's behalf. Similar to the TCGCC member's assurance that the contractor was an employee of TCGCC in *Island Leisure Corp.*, MCC, IPI's general contractor responsible for the construction of the Grand Mariana Casino and Hotel Resort for IPI, introduced Mr. Wu as the individual MCC had been dealing with on behalf of IPI, which contributes to a finding of apparent authority. In further support of Mr. Wu's apparent authority were his two offices—one in the ABC Store building and another that he shared with IPI's general contractor, MCC, at the job site— and his exercise of control over the entire construction project. *See Schoonover v. Carpet World*, 588 P.2d 729, 733 (Wash. 1978) (finding of apparent authority from the salesman's solitary presence in the company office on several occasions and the salesman's "seeming control of the office").

Moreover, both MCC and Mr. Wu represented the urgency of removing the pilings to allow for construction to continue. Finally, Mr. Wu identified a separate need for the removed pilings for IPI's benefit, which was another planned project of IPI. IPI made no affirmative statement that it did not cloak Mr. Wu with apparent authority, rather IPI's inaction indicated the opposite. For example, Mr. Tang met IPI's owner, Mr. Shi, at Mr. Wu's ABC Store office wherein he provided the package of costs and explained everything to Mr. Shi while Mr. Wu was present. (Trial Tr. Vol. I at 19, 65.) Through IPI's omission and acquiescence, IPI permitted Mr. Wu to hold himself out as the one in charge of the construction project and acting on its behalf. Based on a culmination of the aforementioned facts, the Court finds that Mr. Wu had apparent authority to bind IPI to this oral contract. As such, the oral contract is enforceable.

### iii.   IPI breached the oral contract

Having found that the oral agreement is a valid enforceable contract between Tang's Corp. and IPI, the Court now turns to the other two elements for the breach of contract claim—breach and damages. IPI breached the oral contract when it failed to pay Tang's Corp. for the costs it incurred in the storage of the pilings. *See Sin Ho Nam v. Quichocho*, 841 F. Supp. 2d 1152, 1169 (D. N. Mar. I. 2011) (quoting *Reyes v. Ebetuer*, 2 N. Mar. I. 418, 429 (1992)) (Any non-performance of a duty under a contract is a breach.). As for damages, the evidence presented indicates that Tang's Corp. incurred hundreds of thousands of dollars in expenses for the storage of the pilings. The specific figures are detailed further below in the discussion of damages. Therefore, the Court concludes that Tang's Corp. met its burden to prove that IPI is liable for breach of contract.

/ /

### C.  Unjust Enrichment

As an alternative to its breach of contract claim, Tang's Corp. asserts a claim of unjust enrichment. "To prove a claim for unjust enrichment, a claimant must show: (1) the defendant was enriched; (2) the enrichment came at the plaintiff's expense; and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff seeks to recover." *Saipan Air, Inc. v. Stukes*, No. 1:12-CV-00015, 2014 WL 6978488, at *14 (D. N. Mar. I. Dec. 8, 2014) (quoting *Syed v. Mobil Oil Mariana Islands, Inc.*, 2012 MP 20 ¶ 41 (N. Mar. I. 2012)).

Applying all the evidence received at trial, the Court concludes that Tang's Corp. proved each element to establish unjust enrichment. Although it was MCC's obligation to "remove and transport away any debris, garbage and temporary project that are no longer needed from the site" pursuant to MCC's agreement with IPI (Trial Ex. I at 112), IPI wanted to keep the long pilings and reuse them for its Mariana Resort project, rather than have them crushed up like the short rocks. Additionally, the storage of the pilings in the lot in Marpi was convenient because IPI's Mariana Resort project was located near Marpi. Moreover, once Mr. Wu directed Tang's Corp. to store the long pilings for IPI in the presence of MCC, Tang's Corp. was able to coordinate with MCC to remove the pilings from the construction site at IPI's Grand Mariana Casino and Hotel Resort, which allowed construction to resume as these large obstructions impeded movement on the construction site. (*See* Trial Ex. F.) Therefore, the removal and storage of the long pilings enriched IPI. For purposes of this case, Tang's Corp. expended considerable effort and expense for the storage of the long pilings—Tang's Corp. coordinated with the CNMI government to find a suitable location for the storage, applied for permits, paid fees, developed a site plan, procured insurance,

and managed the site for four years. Equity and good conscience militate against permitting IPI to retain the benefit of storing the pilings it intended to use for another one of its projects at Tang's Corp.'s expense, which also allowed construction at the Mariana Casino and Hotel Resort to continue. Tang's Corp. has no use for the pilings; in fact, it appears that no one else on the island of Saipan has any use for the pilings as evidenced by Mr. Tang's futile efforts to find other companies to use them. Additionally, Tang's Corp. had the ability to crush the long pilings so that they could be placed in the landfill and get paid by MCC. However, Tang's Corp. did not crush the long pilings, despite its ability to do so, pursuant to Mr. Wu's instructions to store them so IPI could use them at the Mariana Resort.

Moreover, a principal is required "to make restitution when the principal has accepted a benefit resulting from the actions of an agent or apparent agent and the principal's benefit is at the expense of a third party . . . even though the agent acted without actual authority and the doctrine of apparent authority . . . is unavailable." Restatement (Third) of Agency § 2.07 cmt b. Here, having concluded that IPI did not confer actual authority upon Mr. Wu, IPI nevertheless accepted the benefits of Mr. Wu's negotiations—the storage of the pilings for future use, which also enabled construction to continue at IPI's Grand Mariana Casino and Hotel Resort—at Tang's Corp.'s expense. Therefore, the Court finds that Tang's Corp. has established IPI was unjustly enriched.

### D. DAMAGES

Tang's Corp. claims it is entitled to a total of $246,503.84: $167,520.08 for unpaid fees owed to DPL as of December 2022 with a recurring charge of $2,616.72 per month; $20,983.76 that Tang's Corp. paid DPL for the first year of fees and charges; $2,500 insurance premium for storage of the

pilings; $1,500 fee paid to its engineer; and $54,000 for three[4] years of Tang's Corp.'s management fees. (Pl.'s Sec. Am. Itemized Damages, ECF No. 116.)

"[A] party may recover for restitution under unjust enrichment." *Arman v. JN Saipan CNMI, LLC*, No. 1:21-cv-00024, 2022 U.S. Dist. LEXIS 141607, at *22, 2022 WL 3156501, at *6 (D. N. Mar. I. Aug. 9, 2022) (first quoting *Syed*, 2012 MP 20 ¶ 41; and then citing Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. L. Inst. 2011)).

The evidence presented at trial supports the requested amounts. Tang's Corp. paid DPL $20,983.76 on March 15, 2017 for the Temporary Occupancy Agreement. (*See* Trial Exs. 6, C.) Tang's Corp. incurred $2,500 for the insurance premium for one year of coverage for the lot where the pilings are stored. (Trial Ex. H.) Finally, Mr. Tang testified to paying the engineer Mr. Honey $1,500 and providing at least three years of management services, which amounts to $54,000. Because Tang's Corp. incurred the aforementioned expenses pursuant to the oral contract, the Court awards Tang's Corp. $78,983.76 in damages: which includes $20,983.76 for the 2016-2017 storage fee to DPL paid by Tang's, $2,500 insurance premium for liability insurance for storage, $1,500 fee for preparation of site plan for storage, and $54,000 management fee owed to Tang's Corp. for three years of management services. Alternatively, Tang's is also entitled to this same figure as restitution since IPI was unjustly enriched for the storage of the pilings, and Tang's Corp. incurred these expenses for IPI's benefit. Pursuant to 28 U.S.C. § 1961, this amount shall also accrue post-judgment interest.

---

[4] Although Mr. Tang testified to providing management services for four years, Tang's Corp. only requested three years of services in its second amended itemized damages.

Additionally, as of November 29, 2022, Tang's Corp. has a balance of $164,903.36 in unpaid fees for the Temporary Occupancy Agreement, and DPL continues to charge $2,616.72 a month as a holdover fee. (Trial Ex. 8.) Therefore, as of September 2023, the unpaid fees owed to DPL now total $191,070.56. Although neither party directly raised the issue of whether Tang's Corp. can recover from IPI the outstanding balance Tang's Corp. owes DPL since it has not yet expended the money, the Court finds that such an award is still appropriate. Several jurisdictions agree that "a promisee is not required to pay debts a promisor agreed, but failed, to pay before the promisee can recover damages. . . . [C]onsistent with the Restatement's approach, . . . courts can protect against double recovery by directing the promisee to apply the damages to the debt." *See Campbell v. Parkway Surgery Ctr., LLC*, 354 P.3d 1172, 1183 (Idaho 2015) (citing *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 689 (Tex. 1981); *e.g., id.* at 1183 (first quoting *Meyer v. Parsons*, 62 P. 216, 217 (Cal. 1900), and then quoting *Stout v. Folger*, 34 Iowa 71, 74 (1872)); *see also DeVasto-Piemonte v. Sykes*, No. CA 97-0872A, 2001 WL 495922, at *4 (Mass. Super. May 2, 2001) (citing *Stan Cross Buick, Inc. v. Concord Auto Auction, Inc.*, 212 N.E.2d 862, 863 (Mass. 1965) ("The law also permits the plaintiffs to recover as part of their damages expenses that they are legally liable for even though they have not paid them, as long as they are losses that were caused by the defendant's breach of contract."). Here, IPI (through Mr. Wu) agreed to reimburse Tang's Corp. for all expenses it incurred for the storage of the fees, yet it has failed to pay for those fees, including the DPL fees. As of November 29, 2022, Tang's Corp. has a balance of $164,903.36 it owes DPL pursuant to the Temporary Occupancy Agreement that it entered to store the pilings for IPI's benefit. Therefore, Tang's Corp. is entitled to $191,070.56 in fees that is owed to DPL as of September 2023. IPI shall immediately pay the amount

of $191,070.56 to Tang's Corp. for fees and charges owed to DPL as of September 2023, plus any additional fees and charges that may accrue thereafter; upon its receipt of these funds, Tang's Corp is directed to immediately pay such funds to DPL.

### E.  INJUNCTION

Finally, Tang's Corp. requests an order directing IPI to take possession of the pilings, yet it failed to provide authority or argument in support of such request. (TAC 6; Pl.'s Proposed FFCL 6.) In essence, Tang's Corp. seeks a mandatory permanent injunction since the order would require IPI to act. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019). For a permanent injunction, "a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Id.* at 784.

Applying these elements to the instant case, a mandatory permanent injunction is appropriate. Tang's Corp. has prevailed with actual success on the merits for the breach of contract claim and the alternative of unjust enrichment, as detailed above. "[O]ngoing or future harms" constitute irreparable harm. *Great N. Res., Inc. v. Coba*, No. 3:20-cv-01866-IM, 2020 U.S. Dist. LEXIS 217930, at *5, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020) (first citing *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015); and then citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991). Thus, Tang's Corp. has suffered irreparable injury as it continues to incur monthly charges from DPL as a result of the Temporary Occupancy Agreement that it entered for IPI's benefit. "[A] legal remedy is inadequate if it would require a 'multiplicity of suits.'" *MGM Studios, Inc. v. Grokster,*

21

*Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007). Here, a multiplicity of suits would be required as the Court has only awarded Tang's Corp. the monthly DPL fees it has incurred to date; yet Tang's Corp. will continue to incur these monthly charges while the pilings are still stored on the DPL lot. The balance of hardships weighs in favor of issuing this permanent injunction. While the Court is aware that it would be a burden for IPI to take possession of at least 4,000 tons of cement, Tang's Corp. has incurred much expense and will continue to incur future expenses for the storage of the pilings, which was for IPI's benefit. Moreover, the public interest would not be disserved by this permanent injunction, which affects two private parties and would require one to take possession of its own property. On balance, this Court concludes that a permanent mandatory injunction is required and IPI is ordered to take possession of the pilings within thirty days of this order. IPI argues that the injunction is not warranted because the pilings belong to Tang's Corp. per the Agreement between Tang's Corp. and MCC. (*See* Def.'s Proposed FFCL 2, 13.) The pertinent provision from the Agreement provides that "[t]itle to and ownership of Waste that are authorized and acceptable under the provisions of this Agreement and the applicable Addendum(s) shall transfer to [Tang's Corp.] upon its final acceptance of such Waste for disposal, or final acceptance for transportation if the terms of the applicable Addendum includes transportation of the Waste by [Tang's Corp.]." (Trial Ex. A at 3.) However, the Agreement did not apply to the long pilings selected by IPI as they were not "authorized" as waste because IPI wanted to use them for its Mariana Resort project. The Court concludes that the long pilings were not waste as understood and agreed upon by IPI, MCC, and Tang's Corp. when it was discussed and disclosed to MCC at the January 2016 meeting. Therefore, Tang's Corp. did not accept the pilings as waste and did not assume title to and ownership of the pilings.

### F.  Attorney's Fees

Generally, pursuant to the "American Rule," parties bear their own costs of litigations, except "when authorized by statute, agreed to by contract, or when allowed in judicially established equitable circumstances." *Reyes v. Reyes*, 2004 MP 1 ¶ 17 (N. Mar. I. 2004) (citations omitted). Although Tang's Corp. requested attorney's fees pursuant to law or contract (TAC 7), it failed to cite to authority authorizing attorney's fees. Additionally, while there is an enforceable oral contract, the parties did not agree to reimbursement of attorney's fees and costs to the prevailing party if a dispute were to arise.[5] Therefore, the Court declines to award Tang's Corp. attorney's fees.

### IV.    CONCLUSION

Based on the evidence presented at trial, the Court finds IPI liable to Tang's Corp. for breach of contract and in the alternative for unjust enrichment. The Court awards Tang's Corp. $78,983.76 in damages plus post-judgment interest at the federal rate: which includes $20,983.76 for the 2016-2017 storage fee to DPL paid by Tang's, $2,500 insurance premium for liability insurance for storage, $1,500 fee for preparation of site plan for storage, and $54,000 management fee owed to Tang's Corp. for three years of management services.

Additionally, IPI shall immediately pay the amount of $191,070.56 to Tang's Corp. for fees and charges owed to DPL as of September 2023, plus any additional fees and charges that may accrue

---

[5] Although the draft of the written contract awards the prevailing party attorney's fees and costs (Trial Ex. B at 4-5), the Court has already determined that the terms agreed upon at the January 2016 meeting in the container office govern this dispute.

thereafter; upon its receipt of these funds, Tang's Corp is directed to immediately pay such funds to DPL.

Because the pilings stored on DPL's property at Marpi are the property of IPI, IPI is directed to take possession of the pilings for responsible disposal within thirty (30) days of this Order.

The Clerk of Court shall issue judgment in accordance with this Order.

IT IS SO ORDERED this 18th day of September, 2023.

RAMONA V. MANGLONA
Chief Judge

24